UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHARLES M. CROWLEY,                    )
                                       )
            Plaintiff,                 )
                                       )      No.  4:06CV01686 HEA/FRB
                                       )
v.                                     )
                                       )
                                       )
MICHAEL J. ASTRUE,                     )
Commissioner of Social Security,[1]    )
                                       )
            Defendant.                 )

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This matter is on appeal for review of an adverse ruling by the Social Security Administration. All pretrial matters were referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) for appropriate disposition.

I.   **Procedural Background**

On January 21, 2004, Charles M. Crowley ("plaintiff") filed an application for supplemental security income ("SSI"), alleging disability as of June 15, 1999 due to "problems with right hip and leg", and spots on his lungs".[2] (Tr. 61; 55-56.) Plaintiff's claim

_____

[1]Michael J. Astrue became the Commissioner of Social Security on February 12, 2007. Pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure, he shall be substituted for Acting Commissioner Linda S. McMahon, and former Commissioner Jo Anne B. Barnhart, as defendant in this suit. No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

[2]As the reader will note, _infra_, although plaintiff indicated in his Disability Report that his ability to work is limited by right hip complaints, the medical records document complaints relative only to the left hip, and

-1-

was initially denied, and plaintiff subsequently filed a timely request for a hearing before an administrative law judge ("ALJ") (Tr. 37-42). Plaintiff's first hearing was held on July 19, 2005, before ALJ Robert G. O'Blennis, and a supplemental hearing was held on March 15, 2006. (Tr. 252-309.) On June 22, 2006, ALJ O'Blennis issued his decision denying plaintiff's application for benefits. (Tr. 11-21.) On July 28, 2006, plaintiff filed a Request for Review of Hearing Decision with defendant Agency's Appeals Council, which denied plaintiff's request for review on September 15, 2006.[3] (Tr. 5-9.) The ALJ's decision thus stands as the final decision of the Commissioner. 42 U.S.C. § 405(g).

## II. Evidence Before the ALJ

### A. Hearing Testimony

During plaintiff's first hearing, held on July 19, 2005, plaintiff was represented by counsel and testified on his own behalf. Plaintiff was born on September 11, 1963, is right handed, was 41 years of age at the time of the hearing, and lived at home with his parents. (Tr. 255-56.) He testified that he was six feet tall, and weighed 310 pounds. (Tr. 273.) Plaintiff has a driver's license but no car, and testified that his sister had driven him to the hearing. (Tr. 256.) Plaintiff completed the eleventh grade of high school,

---

that a radiological study revealed arthritis of the left hip. Furthermore, plaintiff alleged left hip pain during his hearing, and his left hip was the focus of the hearing testimony and the Administrative Law Judge's analysis.

[3]The only additional evidence received by the Appeals Council was a July 28, 2006 letter from plaintiff's attorney, Dennis W. Fox. (Tr. 4.)

earned his GED in October of 1983, and took a "building trades" course at the Missouri Career Academy. (Tr. 256-57.) In addition, in the year 2000, plaintiff attended a "building trades" course at MERS (Metropolitan Employment and Rehabilitation Services). (Tr. 257.) Following this, plaintiff worked as a roofer, doing flat top, gable and hot tar roofs. (Tr. 258.) Plaintiff stated that he initially began working as a roofer for someone else, and later became self-employed. Id. Plaintiff testified that he did not report any income on his income taxes. Id. Plaintiff testified that he has three children, aged 25, 22 and 21 years. (Tr. 267.)

Plaintiff has not been employed and has not sought employment since 2000. (Tr. 258-59.) Plaintiff testified that he is able to sit for 45 minutes to one hour, and can stand for 15 to 20 minutes. (Tr. 259.) Plaintiff testified that, while working as a roofer, he lifted as much as 75 to 80 pounds up a ladder and, when doing brick work, he lifted up to 100 pounds. (Tr. 281-82.)

Plaintiff retires at night at approximately 9:30 or 10:00, and rises at 8:30 or 9:00 if it is a "regular nice day." (Tr. 260.) Plaintiff takes 10 to 15 minutes to get up due to stiffness. Id. Plaintiff cooks a breakfast of bacon, eggs and grits for himself and his parents. Id. Plaintiff has no hobbies or interests other than television, but does read his "Narcotics Anonymous Basic" textbook. (Tr. 273.) When asked to describe other daily activities, plaintiff responded that he "hung out" and spent time with his elderly mother, and that he may get her a glass of water. (Tr. 276.) When asked

-3-

whether he made his own bed, plaintiff responded that he could not remember the last time his bed was made, but he does change his own sheets. Id. Plaintiff's mother does the laundry and grocery shopping, and one of plaintiff's daughters takes out the trash when she visits. Id. Plaintiff does not accompany his mother to the grocery store. Id. Before the death of his grandmother in February of 2005, plaintiff attended church once per month. (Tr. 273-74.) Plaintiff testified that, since her death, he does not often attend. (Tr. 273.)

Plaintiff testified that he was once addicted to crack cocaine, but that he has not used it in the past two years, having completed a treatment program at Archway on August 11, 2003. (Tr. 261.) The ALJ extensively questioned plaintiff regarding how he had earned enough money to feed a cocaine addiction severe enough to warrant entering a treatment program. (Tr. 262-65.) Plaintiff testified that he washed cars, ran errands, and stole money from his parents, and bought cocaine in small amounts. (Tr. 262-65.) At the time of the hearing, plaintiff was attending various Narcotics Anonymous groups five nights per week, and his sponsor provided his transportation. (Tr. 266.) Plaintiff testified that, other than attending these group meetings, he rarely goes out, but occasionally visits his children. (Tr. 267.) Plaintiff's eldest child lives by herself, and his two younger children live with their mother. (Tr. 268.) Plaintiff has one sister who lives in California, and who travels to visit him. Id. Plaintiff has not traveled to visit her

-4-

in the last two years.  (Tr. 269.)

Plaintiff testified that, in December 2004, he went to the emergency room of St. Mary's Hospital in Clayton, Missouri, following a car accident.  (Tr. 278-79.)  Plaintiff underwent hip x-rays.  (Tr. 279.)  Plaintiff testified that he thinks he was given Ibuprofen. Id.

Other than this emergency room visit, plaintiff has not received medical treatment since December of 2003.  (Tr. 269-70.) Plaintiff testified that this was because his insurance ended, but denied that he had ever been refused medical treatment.  Id. Plaintiff last applied for Medicaid one year ago.  (Tr. 269-70.) The ALJ noted that the record reflected that plaintiff had not received treatment at the People's Clinic for longer than two months and plaintiff disagreed, stating that he had received a longer course of treatment, and had indeed been referred to a "bone specialist" and had undergone some sort of testing.  (Tr. 270-71.)  The ALJ and plaintiff had the following exchange regarding plaintiff's pursuit of follow-up medical treatment:

Question (by the ALJ):    And it looks like they sent you to a
                          pulmonologist also – –

Answer (by plaintiff):    Yeah.

Q.    – – for breathing?

A.    Yes, sir.  That was also at Homer G.

Q.    All right.  But you never went back?

A.    Yeah, I went and made the appointment.  I mean I made the
      appointments.

-5-

Q. Okay. But why'd you stop going?

A. I mean they referred me back to my doctor at - - Mr. - - Dr. Ned Johnson at Connect Care.

Q. All right. Did Connect Care refuse to see you?

A. No. But I mean  - - I don't know. Well, it looked to me the doctor had - - if it - - there wasn't too much - - pretty much more they could do. You know, they had ran the test.

(Tr. 271-72.)

Plaintiff testified that he currently takes Combivent[4] for his breathing problems. (Tr. 272.) The ALJ asked plaintiff where he obtained Combivent, and plaintiff replied that he had been given sample inhalers. Id. Plaintiff stated that he used the inhalers "as needed," and that he did not need them if he was not moving around. (Tr. 272-73.)

Plaintiff testified that he had gained weight because he was unable to play volleyball and softball as he once did. (Tr. 274.) Plaintiff denied being on a diet, and the ALJ noted that he had been placed on a low cholesterol diet in 2003. Id. Plaintiff explained that the diet was temporary and that he did not follow it. (Tr. 275.)

Plaintiff previously worked in a turkey processing plant in Jefferson City, Missouri. Id. Plaintiff had been imprisoned in the

---

[4]Combivent is a combination of ipratropium and albuterol, and is used to prevent wheezing, breathing difficulties, chest tightness, and coughing in people with chronic obstructive pulmonary disease (COPD; a group of diseases that affect the lungs and airways) such as chronic bronchitis (swelling of the air passages that lead to the lungs) and emphysema (damage to the air sacs in the lungs).
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601063.html

penitentiary there for two years.  Id.  Plaintiff testified that he had also served a 120-day sentence for an apparent drug offense in 1995.  Id.

Under questioning from his attorney, plaintiff testified that he smoked two to two and one-half packs of cigarettes per day. (Tr. 277.)  Plaintiff testified that he is depressed, and wishes to see a mental health professional to "find out why I feel so lousy all the time." (Tr. 277-78.)  Plaintiff denied suicidal ideation. (Tr. 278.)  Plaintiff takes Aleve[5] "just about every day." (Tr. 279-80.) Plaintiff's parents give him money to buy cigarettes. (Tr. 280.)

The ALJ heard testimony from Mr. John Stephen Dolan, a vocational expert ("VE").  Mr. Dolan testified that plaintiff's former roofing work was classified as heavy. (Tr. 282.)  The ALJ asked Mr. Dolan to assume a hypothetical individual of plaintiff's age, education and work experience, and assume that person had the ability to lift 50 pounds occasionally and 25 pounds frequently, and stand and/or walk six hours in an eight-hour day, but was limited in that he should avoid working in areas with concentrated exposure to pulmonary irritants. (Tr. 283.)  The VE opined that such an individual would be unable to perform plaintiff's past relevant work, but would be able to perform stocking jobs (of which there were 9,000 jobs in the St. Louis Metropolitan area), or work as a hospital food

---

[5]Aleve, or naproxen, is an over-the-counter medication used to reduce fever and to relieve mild pain from headaches, muscle aches, arthritis, menstrual periods, the common cold, toothaches, and backaches. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a681029.html

service worker or busboy (of which there were 3,000 and 5,000 jobs, respectively).  Id.  The ALJ asked the VE to consider an individual able to perform only light exertional work, involving lifting a maximum of 20 pounds and frequently lifting ten, with the same restrictions applicable to exposure to pulmonary irritants.  Id.  The VE opined that such a person would be able to work as a fast-food counter worker or cashier, of which there were 15,000 and 14,000 jobs available locally.  Id.  The ALJ asked the VE to alter the hypothetical to involve a person able to work at the sedentary level, with an ability to lift a maximum of ten pounds and stand and/or walk only two hours in an eight-hour day, but with all other restrictions the same as the original hypothetical.  (Tr. 284.)  The VE opined that such a person would be able to work as a sedentary unskilled assembler (2,000 jobs available locally) and as a food and beverage order clerk (1,000 jobs available locally).  Id.  The VE further opined that, if the geographical area were increased to include the whole state of Missouri, the number of available jobs would double. Id.  When asked to add to all of the foregoing hypotheticals a requirement that the individual avoid concentrated exposure to extreme temperatures and humidity, the VE testified that such restrictions would not preclude the performance of any of the aforementioned jobs.  Id.

Plaintiff's attorney indicated to the ALJ that the record lacked disability determinations, and the ALJ indicated his intent to

send plaintiff for a medical examination.[6] (Tr. 285.) This concluded plaintiff's first hearing.

A supplemental hearing was held before ALJ O'Blennis on March 15, 2006, in order to address the functional limitations identified by Dr. Bhattacharya during plaintiff's August 17, 2005 medical evaluation. (Tr. 287-309.) Testimony was again elicited from Mr. Dolan, the VE who had testified during plaintiff's first hearing. Mr. Dolan testified that he had reviewed Dr. Bhattacharya's assessment, and considered the limitations assessed therein. (Tr. 295-97.) Plaintiff's attorney questioned Mr. Dolan regarding whether Dr. Bhattacharya's report could be interpreted as limiting plaintiff such that he was unable to work a full eight-hour work day. (Tr. 295.) Mr. Dolan testified that Dr. Bhattacharya had limited plaintiff to sitting less than six hours in an eight-hour day, but indicated that plaintiff could stand and/or walk for at least two hours of an eight-hour day. (Tr. 295-96.) Mr. Dolan noted that, on the form, Dr. Bhattacharya was given the option of limiting plaintiff to less than two hours of standing/walking, but did not. (Tr. 296.) Mr. Dolan concluded that the doctor's assessment allowing plaintiff to stand/walk for at least two hours in an eight-hour day, and sit for less than six hours, resulted in a classification between light and sedentary work. Id. Mr. Dolan further noted that the doctor did not limit plaintiff's ability to use his hands, which was the most

---

[6]The record indicates that plaintiff indeed saw Sarwath Bhattacharya, M.D., of Forest Park Medical Clinic, on August 17, 2005. (Tr. 119-28.)

-9-

important consideration in terms of sedentary work.   Id.

Having noted these limitations, and having re-examined plaintiff regarding his age, education and work background, the ALJ posed a new hypothetical to the VE, asking him to assume an individual of plaintiff's age, with his education and work experience, with the following abilities and limitations: The ability to lift 25 pounds occasionally/frequently; sit for at least four hours but not six; stand and/or walk up to four hours; take normal breaks; avoid the use of the lower left extremity; no more than occasional climbing, balancing, kneeling, crouching, crawling and stooping; avoid extreme temperatures and dusty, humid and/or wet environments; avoid unprotected heights and unprotected dangerous machinery; and avoid exposure to fumes, odors, chemicals and gases. (Tr. 300.)   The VE testified that an individual with such restrictions could work as a cashier, food and beverage order clerk, or general office helper, and further indicated that these jobs meeting these restrictions existed in substantial numbers.  (Tr. 301.)  The ALJ added to the hypothetical that the individual would need to alternate sitting and standing beyond normal break time frequencies, inasmuch as the individual could not sit or stand without changing position more than 30 or 45 minutes, and would have to alternate throughout the eight-hour day.   Id.  The VE testified that such limitations would not preclude the performance of any of the jobs he cited, stating that those jobs would allow the worker to change positions between sitting and standing.   Id.

-10-

Plaintiff responded to questioning from the ALJ and his attorney. Plaintiff testified that he had not seen a doctor, other than Dr. Bhattacharya, since his first hearing. (Tr. 305.) Plaintiff was taking no medications, other than "over-the-counter stuff." Id. Plaintiff indicated that standing was painful after fifteen minutes, that he could sit for one hour. Id. Plaintiff testified that he spent most of the day lying down on the couch with his feet elevated, and had trouble changing from a seated to a standing position. (Tr. 306.) The ALJ inquired whether plaintiff had ever had an x-ray of his hip, and plaintiff testified that he had one performed at St. Mary's Hospital the year before last. (Tr. 307.) Plaintiff testified that the doctor told him that his hip was "worn out." Id. The ALJ requested a copy of the St. Mary's Hospital x-ray report.[7] This concluded the supplemental hearing. (Tr. 308.)

B. Medical Records

Records from Saint Louis ConnectCare ("ConnectCare") indicate that plaintiff was seen on September 2, 2003 with complaints of aching in his knees bilaterally, stating that over-the-counter medications were not helping his symptoms. (Tr. 100.) Plaintiff denied chest pain and shortness of breath. (Tr. 101.) Plaintiff was diagnosed with hypertension and polyarthralgia (pain in two or more

_____

[7]The record indicates that the ALJ received this x-ray report on May 26, 2006 and considered it in his decision. (Tr. 248-49; 16.)

-11-

joints), and was given lisinopril,[8] Soma,[9] and Tylenol.  Id.

Records from the People's Health Center indicate that plaintiff was treated there from October 14, 2003 through December 2, 2003.  (Tr. 109.)  On October 14, 2003, plaintiff presented with complaints of leg pain.  (Tr. 111.)  Plaintiff was noted to walk with a limp.  (Tr. 112.)  The assessment was leg pain, and rule out osteoarthritis in the hip.  Id.  Plaintiff was advised to stop smoking and lose weight, and was given Motrin.  Id.  Plaintiff next presented on November 21, 2003, and reported no change in his hip pain.  (Tr. 115.)  Plaintiff was still smoking, and had gained weight.  Id.  He was not found to be in respiratory distress, but did have a cough and shortness of breath.  Id.  He was given samples of Advair.[10]  (Tr. 116.)  On December 2, 2003, plaintiff presented for foot care and evaluation, and had a painful lesion on his foot with no ulceration.  (Tr. 118.)  It was noted plaintiff had full range of motion and strength, but pain in his left hip.  Id.  It was also noted that plaintiff walked with a "waddling gait."  Id.

Plaintiff was seen again at ConnectCare Pulmonology on December 8, 2003 with complaints of shortness of breath "after

---

[8]Lisinopril is used to treat hypertension.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a692051.html

[9]Soma or Carisoprodol, a muscle relaxant, is used with rest, physical therapy, and other measures to relax muscles and relieve pain and discomfort caused by strains, sprains, and other muscle injuries.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682578.html

[10]Advair is a combination of fluticasone and salmeterol, and is used to prevent wheezing, shortness of breath, and breathing difficulties caused by asthma and COPD.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a699063.html

walking a couple of blocks." (Tr. 105.) Plaintiff also complained of occasional wheezing, and disturbed sleep with some sleep apnea and daytime sleepiness, but denied chest pain. Id. He reported taking Combivent, and stated that he smoked one pack of cigarettes per day. Id. The impression was COPD.[11] (Tr. 106.) The pulmonologist's notes indicate that the importance of smoking cessation was heavily stressed; in fact the physician wrote "quit smoking, quit smoking, quit smoking, quit smoking". (Tr. 106, 107.) Plaintiff's Combivent was discontinued, and he was given Albuterol[12] and Atrovent.[13] (Tr. 107.) Plaintiff was also given nicotine patches to aid in smoking cessation, and advised to follow-up in three months. Id.

Plaintiff was seen in the emergency room of St. Mary's Health Center on December 30, 2004 with complaints of neck pain, low back pain, left hip pain, and trouble breathing following a car accident. (Tr. 129-30, 136-37.) It was noted that he was taking no medications. (Tr. 130.) Plaintiff reported that he had been driving at the time of the accident. (Tr. 137.) Upon physical exam, plaintiff's lungs were clear, and there was some spinal tenderness at

---

[11]COPD stands for Chronic Obstructive Pulmonary Disease. COPD is a group of lung diseases that cause swelling of the airways. Emphysema and chronic bronchitis are the most common forms.
http://www.nlm.nih.gov/medlineplus/ency/article/000091.htm

[12]Albuterol is a bronchodilator used to prevent and treat wheezing, difficulty breathing and chest tightness caused by lung diseases such as asthma and COPD.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a607004.html

[13]Atrovent, or ipratropium oral inhalation, is a bronchodilator used to prevent wheezing, difficulty breathing, chest tightness, and coughing in people with COPD.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695021.html

the lower cervical spine and in the lumbar area. (Tr. 137-38.) Plaintiff had no tenderness in his left hip, but did have left hip pain when bearing weight, and was noted to have a slight limp. (Tr. 138.) Plaintiff's neurological exam was normal. Id. X-rays of plaintiff's cervical spine were normal. (Tr. 138, 249.) X-rays of plaintiff's left hip revealed "marked degenerative arthritis" with spurring. Id. The impression was paracervical and paralumbar strain, and left hip degenerative arthritis. Id.

On August 17, 2005, plaintiff saw Dr. Bhattacharya for a medical evaluation. (Tr. 119-28.) Plaintiff's chief complaints were left hip pain, emphysema, and hypertension. (Tr. 119.) Dr. Bhattacharya noted that plaintiff was last employed in 2003 and was "let go" because he was unable to ascend and descend a ladder. Id. Plaintiff told Dr. Bhattacharya that his left hip pain began "a long time ago." Dr. Bhattacharya wrote: "X-rays were taken last year and he was told the left hip is 'worn out.' He was advised hip replacement after he reduces his weight."[14] Id. Plaintiff stated that he uses a cane, which he bought for himself, outside and on uneven terrain, but does not use it at home. Id. Plaintiff reported taking no pain medication. (Tr. 119.) Plaintiff stated that the pain worsened when he moved his left hip, and stated he was unable to

_____

[14]As noted above, during the supplementary hearing, the ALJ asked plaintiff whether he had ever had an x-ray of his hip, and plaintiff responded that he had one at St. Mary's Hospital the year before last, which would be the year 2004. (Tr. 307.) This is consistent with the medical evidence of record indicating plaintiff's December 30, 2004 hip x-ray at St. Mary's Hospital, the only hip x-ray in the record. (Tr. 249.) Physician and hospital records do not indicate that hip surgery was ever recommended.

-14-

bend down to cut his toenails.  Id.  Dr. Bhattacharya noted that plaintiff had a history of emphysema or COPD, and that he had a history of childhood asthma but no pneumonia.  Id.  Plaintiff denied hospitalizations, but stated that he went to the emergency room "two or three times until December of 2004" for acute shortness of breath, and was given nebulizer treatments and prescribed inhalers.  Id.  Plaintiff stated he could walk two flights of steps on a good day, and could lift about 30 pounds.  (Tr. 120.)  Dr. Bhattacharya also noted plaintiff's history of hypertension, noting that plaintiff was not currently taking medication and denied chest pain, but did have shortness of breath upon exertion.  Id.  Plaintiff had no trouble breathing when lying down, no swelling in his feet, and no trouble breathing at night.  Id.

Plaintiff denied a history of coronary artery disease or diabetes, but did state that he had been told he had increased cholesterol.  Id.  Plaintiff complained of no other joint pain other than his left hip.  (Tr. 120.)  Plaintiff stated that he could walk only two blocks and can stand and sit for only 20 minutes because of hip pain.  Id.  Dr. Bhattacharya's record indicates that, at home, plaintiff did the cooking and cleaning and some of the laundry, but did not drive.  Id.  Dr. Bhattacharya wrote "He watches TV.  He sits down most of the time."  Id.

Upon exam, Dr. Bhattacharya noted that plaintiff was in no acute distress.  (Tr. 120-21.)  He was 71.5 inches tall, and weighed 311 pounds.  (Tr. 120.)  Plaintiff's lungs were clear to auscultation

and percussion, but had decreased breath sounds in both bases. (Tr. 121.) Dr. Bhattacharya noted that, although plaintiff brought a cane with him, he was able to walk without it for a short distance on even terrain, and his gait was within normal limits. Id. Plaintiff was able to walk on his heels and his toes, but had trouble squatting, and had trouble getting on and off the examination table. Id. Straight leg raise was slightly reduced, and he had no paravertebral muscle spasm in his back. Id.

Plaintiff had dexterous movement of his fingers for gross and fine manipulation, and his hand grip was 5/5. (Tr. 121.) He had a good range of movement of both upper extremities and in the right extremity, but a somewhat decreased range of movement with pain in the left hip area.[15] Id. There was mild tenderness in the greater trochanter area, and there was no swelling. Id. Plaintiff's neurological assessment was normal. Id. Dr. Bhattacharya's clinical impression was left hip pain with decreased range of movement, COPD, hypertension, and obesity. (Tr. 121-22.)

Dr. Bhattacharya completed a Medical Source Statement of plaintiff's ability to perform work-related activities, in which he opined that plaintiff had the following abilities and limitations: frequently and occasionally lift and/or carry 25 pounds; stand and/or

_____

[15]Plaintiff's forward flexion was 100 on the right and 90 on the left (on a 0 to 100 degree scale); backward extension was 30 on the right and 20 on the left (on a 0 to 30 degree scale); abduction was 40 on the right and 20 on the left (on a 0 to 40 degree scale); and adduction was 20 on the right and 10 on the left (on a 0 to 20 degree scale). (Tr. 124.) Straight leg raising was within 10 degrees of full bilaterally in the supine position, and full bilaterally in the seated position. Id.

walk at least two hours in an eight-hour workday; sit for less than six hours in an eight-hour workday; and limitations in the ability to push and/or pull using his lower extremities. (Tr. 125-26.) Dr. Bhattacharya further opined that plaintiff should only "occasionally" climb, balance, kneel, crouch, crawl or stoop. (Tr. 126.) Dr. Bhattacharya opined that plaintiff's manipulative functions (the ability to reach, handle, finger and feel), and his visual/communicative functions, were unlimited. (Tr. 127.) Dr. Bhattacharya opined that plaintiff should have only limited exposure to temperature extremes, dust, humidity or wetness, hazards such as machinery and heights, and fumes/odors. (Tr. 128.) On January 7, 2006, plaintiff visited the emergency room of St. Mary's Health Center with complaints of persistent, intermittent abdominal pain. (Tr. 139-57.) Plaintiff also complained of chronic shortness of breath upon exertion, and left hip joint pain. Id. Plaintiff was examined by Jay Reid, M.D., who noted plaintiff's chief complaints were shortness of breath and abdominal pain, and further noted that plaintiff attributed his complaints to anxiety related to a recent upsetting incident. (Tr. 156.) Dr. Reid's note indicates that plaintiff had "[N]o musculoskeletal complaints", and further indicated that plaintiff did "not appear to be in any distress at all." Id. Plaintiff's examination was normal. (Tr. 156-57.) Dr. Reid recommended that plaintiff be given Dilaudid[16] via IV "even

_____

[16]Dilaudid, or hydromorphone, is a strong pain reliever. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601148.html

-17-

though he does not seem like he is in that much pain." (Tr. 157.) Dr. Reid also recommended plaintiff be given Zofran,[17] and recommended a work-up including an obstructive series, chest x-ray, breathing treatments, and baseline labs. Id.

Nursing notes indicate that plaintiff later asked to speak to the doctor, and said that he did not want to stay. (Tr. 161.) Nursing notes further indicate that plaintiff later reported that his pain was gone, and was observed a short while later resting and talking on his cell phone. Id. Also included in the hospital records is a "24 Hour Patient Care Record" in which it is noted that plaintiff "denies any pain." (Tr. 178.) The hospital records further indicate that the medical work-up and diagnostic testing recommended by Dr. Reid was not performed because plaintiff left the hospital against medical advice, having signed a "Release of Responsibility" form in which he refused medical screening exams and care, and indicated his wish to leave the hospital against medical advice. (Tr. 147.)

Notable in the hospital's "Admission Record" is an entry under the heading "Patient's Employer." (Tr. 139.) In the space provided, next to plaintiff's name, address, and social security number, is the entry "Charley's Lounge, 4755 McMillian Ave., St. Louis, MO 63133," and a telephone number. Id. Plaintiff's name and identifying information is also included in the "Guarantor" section,

---

[17]Zofran, or Ondansetron, is used to relieve nausea and vomiting. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a601209.html

and the same employer is listed in under the heading "Guarantor's Employer." Id. It is further indicated that plaintiff's occupation was "Manager." Id.

Plaintiff returned to St. Mary's Health Center on January 16, 2006. (Tr. 190-247.) Again, the Admission Record indicated that plaintiff was employed as a manager at Charley's Lounge. (Tr. 190.) Plaintiff was examined by Robert L. Mudd, M.D., for complaints of shortness of breath, nausea, vomiting and stomach pain. (Tr. 205-07.) Dr. Mudd noted that plaintiff presented with these symptoms on January 7, but that he signed out against medical advice due to "difficulty with child care issues," and was presenting now to complete his evaluation. (Tr. 205.) Upon examination, Dr. Mudd noted that plaintiff was in no acute distress, and that he "prefers to sleep." (Tr. 206.) A chest x-ray revealed some bilateral apical bullae, worse on the right, and no infiltrate or effusion. Id. Plaintiff was given Toradol[18] with "significant improvement" in pain. (Tr. 207.)

Plaintiff was also examined by Lee C. Hanson, M.D., for complaints of increased nocturnal breathing difficulties and mild, intermittent abdominal pain. (Tr. 200.) Plaintiff reported that he smoked one pack of cigarettes per day. Id. Plaintiff reported that he stopped using Combivent because he ran out and did not have it refilled, and denied the use of any other medications. Id.

---

[18]Toradol, or Ketorolac, is used on a temporary basis to relieve moderately severe pain.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a693001.html

Upon examination, Dr. Hanson noted that plaintiff was moderately obese and in no acute distress. (Tr. 203.) Plaintiff's physical exam was normal. Id. Dr. Hanson diagnosed plaintiff with bullous emphysema, and the importance of smoking cessation was stressed. Id. Under the heading "Restrictions of Activity," Dr. Hanson wrote "As tolerated." (Tr. 201.) Dr. Hanson further noted that plaintiff reported that he obtained his medicines "from Peoples' Clinic but said if they will not provide them, he is prepared to pay for the patch and possibly the Wellbutrin as well." (Tr. 203.) It is noted that plaintiff's abdominal pain had resolved, and he was discharged on January 17, 2006 with instructions to take Combivent and Wellbutrin,[19] and to use a Nicotine patch. (Tr. 199.) On plaintiff's "Discharge Instructions" form, Dr. Hanson indicated that plaintiff had "no restrictions" on his activities. Id.

Nursing notes indicate that, although plaintiff was placed on "NPO"[20] status (meaning he should not eat or drink), he was observed eating food which had been brought to him by a family member. (Tr. 235.) The nursing notes further indicate that, although plaintiff's NPO status was explained to him and he verbalized an understanding of it, he continued eating. Id. These nursing notes further indicate that plaintiff later denied shortness of breath or pain. Id.

---

[19]Wellbutrin, or Buproprion, is used to treat depression.
http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a695033.html

[20]NPO is an abbreviation of the latin phrase "*nil per os*," meaning "nothing by mouth."
http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=NPO

The hospital records do not indicate that plaintiff complained of left hip pain at any time during his January 16, 2006 visit.  <u>See</u> (Tr. 190-247.)

**III.     The ALJ's Decision**

The ALJ found that plaintiff had not engaged in substantial gainful activity since January 21, 2004, the application filing date. (Tr. 19.)  The ALJ found that plaintiff had obesity, osteoarthritis of the left hip, hypertension, COPD/bullous emphysema, elevated cholesterol, and possible gastroenteritis, but that no impairment or combination of impairments was of listing-level severity.  <u>Id.</u>  The ALJ found that plaintiff's allegations of symptoms precluding all work were not credible.  <u>Id.</u>

The ALJ found that plaintiff had no past relevant work, and that his limitations precluded the performance of the full range of light-sedentary work.  (Tr. 20.)  The ALJ found that plaintiff had the residual functional capacity ("RFC") to perform the physical exertional and nonexertional requirements of other work that did not require the following:  "lifting or carrying of more than 25 pounds; standing, walking or sitting more than 4 hours out of an 8-hour day; operating foot controls with the left lower extremity; doing more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling; working at unprotected heights or around dangerous moving machinery; or concentrated or excessive exposure to dust, fumes, chemicals, temperature extremes, high humidity or dampness, and other typical allergens, pollutants, and atmospheric irritants."

-21-

(Tr. 20.) Based upon VE testimony, the ALJ concluded that there were a significant number of jobs in the local and national economies that plaintiff could perform, such as cashier, food and beverage clerk, and general office helper. Id. The ALJ found that plaintiff had no substance abuse disorder that was uncontrollable and prevented the performance of substantial gainful activity. Id.

The ALJ listed several factors relevant to credibility determination in social security disability cases, applied those factors to plaintiff's case, and determined that plaintiff's allegations of impairments precluding all work were not credible.[21] The ALJ noted that plaintiff had a poor work history, and that this did nothing to enhance his credibility as one ever motivated to work outside of his home, even before the onset of his alleged disability. (Tr. 15-16.) The ALJ noted that plaintiff did not regularly take any prescription or over-the-counter pain medications, and that there was no documentation that plaintiff suffered side effects when he did take medication. (Tr. 18.) The ALJ noted that plaintiff had no regular, sustained medical treatment, and that the treatment he did have was conservative. Id.

The ALJ considered the possibility that plaintiff's lack of medications and medical care could be due to an inability to pay, but noted that the record was void of evidence that plaintiff was ever denied treatment or medications, and inferred that plaintiff did not get medical treatment more often because he did not feel a medical

---

[21]Plaintiff herein does not dispute the ALJ's credibility determination.

-22-

need for it.  Id.  The ALJ further noted that plaintiff continued to smoke despite continued and emphatic advice from physicians that he stop, noting that this was evidence that plaintiff did not feel his shortness of breath was bad enough to induce him to quit smoking. Id.

The ALJ noted the lack of objective medical evidence in the record indicative of disability; particularly the lack of surgery, lengthy hospitalizations, or referrals to physical therapy or pain management. (Tr. 18.)  The ALJ noted that no doctor who had treated or examined plaintiff had stated or implied that he was disabled or totally incapacitated.  Id.  The ALJ noted that plaintiff did not have most of the physical signs typically associated with chronic, severe musculoskeletal pain, such as atrophy, muscle spasm, neurological deficits, signs of nerve root impingement, or significantly abnormal radiological studies, to name a few.  Id.  The ALJ found no documented evidence of any kind of mental or mood disorder, or any sort of mental restrictions or limitations, and further noted that plaintiff displayed no such limitations during either hearing. (Tr. 19.)  The ALJ then concluded that plaintiff was not under a "disability" as defined in the Act at any time through the date of his decision.  Id.

## IV.  Discussion

To be eligible for Social Security disability benefits under the Social Security Act, a plaintiff must prove that he is disabled.  Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.

2001); <u>Baker v. Secretary of Health & Human Services</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines "disability" in terms of the effect a physical or mental impairment has on a person's ability to function in the workplace. It provides disability benefits only to persons who are unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). It further specifies that a person must "not only [be] unable to do his previous work but [must be unable], considering his age, education, and work experience, [to] engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work." 42 U.S.C. § 423(d)(2)(A); <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140 (1987); <u>Heckler v. Campbell</u>, 461 U.S. 458, 459-460 (1983).

To determine whether a claimant is disabled, the Commissioner utilizes a five-step evaluation process. <u>See</u> 20 C.F.R. §§ 404.1520, 416.920; <u>Bowen</u>, 482 U.S. at 140-42. The Commissioner begins by considering the claimant's work activity. If the claimant is engaged in substantial gainful activity, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe impairment," meaning one which significantly limits his

-24-

ability to do basic work activities.  If the claimant's impairment is not severe, then he is not disabled.  The Commissioner then determines whether claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1.  If claimant's impairment is equivalent to one of the listed impairments, he is conclusively disabled.  At the fourth step, the Commissioner establishes whether the claimant has the residual functional capacity to perform his past relevant work.  If so, the claimant is not disabled.  If not, the burden then shifts to the Commissioner to prove that there are other jobs that exist in substantial numbers in the national economy that the claimant can perform.  Pearsall, 274 F.3d at 1217, Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000). Absent such proof, the claimant is declared disabled and becomes entitled to disability benefits.

The Commissioner's findings are conclusive upon this Court if they are supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Young o/b/o Trice v. Shalala, 52 F.3d 200 (8th Cir. 1995), citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  Substantial evidence is less than a preponderance, but enough that a reasonable person would find adequate to support the conclusion.  Briggs v. Callahan, 139 F.3d 606, 608 (8th Cir. 1998).  To determine whether the Commissioner's decision is supported by substantial evidence, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ;

-25-

2.    The plaintiff's vocational factors;

3.    The medical evidence from treating and
      consulting physicians;

4.    The plaintiff's subjective complaints
      relating to exertional and non-exertional
      activities and impairments;

5.    Any corroboration by third parties of the
      plaintiff's impairments;

6.    The testimony of vocational experts, when
      required, which is based upon a proper
      hypothetical question which sets forth the
      plaintiff's impairment.

Stewart v. Secretary of Health & Human Services, 957 F.2d 581, 585-86

(8th Cir. 1992), quoting Cruse v. Bowen, 867 F.2d 1183, 1184-85 (8th

Cir. 1989).

        The Court must also consider any "evidence which fairly

detracts from the ALJ's findings." Groeper v. Sullivan, 932 F.2d

1234, 1237 (8th Cir. 1991); see also Briggs, 139 F.3d at 608.

However, where substantial evidence supports the Commissioner's

decision, the decision may not be reversed merely because substantial

evidence may also support a different outcome. Briggs, 139 F.3d at

608; Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992), citing

Cruse, 867 F.2d at 1184.

        In the case at bar, plaintiff argues that the ALJ's

decision was in error because he failed to consider plaintiff's RFC

in accordance with the standards contained in Lauer v. Apfel, 245

F.3d 700 (8th Cir. 2001) and Singh v. Apfel, 222 F.3d 448 (8th Cir.

2000), inasmuch as the ALJ failed to consider plaintiff's obesity in

-26-

accordance with the Commissioner's guidelines, evidenced by his failure to cite Social Security Ruling 02-1p. Plaintiff argues that he had a high body mass index, or BMI, score, and that obesity alone is medically equivalent to a listed impairment. In support, plaintiff offers several examples of the potential effects of obesity on the human body. Plaintiff further argues that the ALJ ignored the consultative physician's opinion regarding his ability to sit, stand and walk, arguing that the physician's opinion should have been interpreted as precluding the performance of full-time work.

Plaintiff further contends that the ALJ failed to ensure a fully and fairly developed record, inasmuch as Dr. Bhattacharya's consultative opinion was the only evidence in the record addressing plaintiff's ability to work. Plaintiff contends that Dr. Bhattacharya's opinion was unclear regarding whether plaintiff could actually sit for six hours, and concludes that the ALJ improperly speculated upon what conclusions were drawn by Dr. Bhattacharya. Finally, plaintiff contends that the hypothetical question posed to the VE was not based upon the evidence of record, and the VE's response could not therefore be considered substantial evidence to support the ALJ's conclusion. In response, the Commissioner argues that substantial evidence supports the ALJ's decision.

A.  Residual Functional Capacity Determination

In this case, the ALJ found that plaintiff retained the residual functional capacity to perform other work which existed in substantial numbers in the national economy, as described, supra.

-27-

Plaintiff argues that the ALJ's finding was in error and runs afoul of Eighth Circuit precedent. The undersigned disagrees.

Residual functional capacity is what a claimant can do despite his limitations. 20 C.F.R. § 404.1545, Lauer v. Apfel, 245 F.3d 700, 703 (8th Cir. 2001). The ALJ must assess a claimant's RFC based upon all relevant, credible evidence in the record, including medical records, the observations of treating physicians and others, and the claimant's own description of his symptoms and limitations. Anderson v. Shalala, 51 F.3d 777, 779 (8th Cir. 1995); Goff v. Barnhart, 421 F.3d 785, 793 (8th Cir. 2005); 20 C.F.R. §§ 404.1545(a), 416.945(a). A claimant's RFC is a medical question, and there must be some medical evidence, along with other relevant, credible evidence in the record, to support the ALJ's RFC determination. Id.; Hutsell v. Massanari, 259 F.3d 707, 711-12 (8th Cir. 2001); Lauer, 245 F.3d at 703-04; McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000). An ALJ's RFC assessment which is not properly informed and supported by some medical evidence in the record cannot stand. Hutsell, 259 F.3d at 712. However, although an ALJ must determine the claimant's RFC based upon all of the relevant, credible evidence of record, the ALJ is not required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. Pearsall, 274 F.3d at 1217 (8th Cir. 2001); McKinney, 228 F.3d at 863. The claimant bears the burden of establishing his RFC. Goff, 421 F.3d at 790.

Plaintiff first argues that the ALJ's RFC determination is

legally insufficient because he failed to properly consider plaintiff's obesity.  In support, plaintiff notes with disapproval the ALJ's failure to cite Social Security Ruling 02-1p, emphasizes that he has a high BMI score, and discusses the various ways obesity can harm the human body.  However, as the Commissioner correctly notes, SSR 02-1p is not helpful to plaintiff, and in fact provides that, although body mass index, or BMI, scores are descriptive of the extent of one's obesity, "they do not correlate with any specific degree of functional loss."[22]

The Commissioner further correctly asserts that, although obesity can certainly cause functional restrictions in some people, the record contained no evidence that plaintiff himself had any medically imposed limitations attributable to obesity.  Furthermore, the undersigned notes that plaintiff did not testify during either hearing that he had any functional limitations directly attributable to obesity.[23]  See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004) ("Although his treating doctors noted that Forte was obese and should lose weight, none of them suggested his obesity imposed any additional work-related limitations, and he did not testify that his obesity imposed additional restrictions.")  Finally, plaintiff's

---

[22]As the Commissioner notes, SSR 02-1p is available at http://www.ssa.gov./OP_Home/rulings/di/01/SSR2002-01-di-01.html.

[23]During plaintiff's first hearing, he testified that he had gained weight because he was unable to work it off.  (Tr. 274.)  During his second hearing, plaintiff testified that he was gaining weight because his hip restricted his activity, and stated "And it's not helping to help any either." (Tr. 305.)

discussion of the ways in which obesity might harm the human body and result in functional restrictions is irrelevant to the determination of whether plaintiff himself is disabled due to obesity.

Plaintiff next contends that the ALJ ignored Dr. Bhattacharya's opinion regarding plaintiff's ability to sit, stand and walk, and argues that the report should have been interpreted to preclude the performance of full-time work. The undersigned disagrees.

The ALJ found that medical evidence supported the conclusion that plaintiff could work with the following limitations: no lifting or carrying more than 25 pounds; no standing, walking or sitting more than four hours; no operating foot controls with the left leg, no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling; no working at unprotected heights or around dangerous moving machinery; no work involving concentrated exposure to various allergens and/or irritants; and no work involving exposure to temperature and humidity extremes. This finding is consistent with the limitations imposed by Dr. Bhattacharya, and is consistent with the balance of the medical evidence on the record as a whole.

On his Medical Source Statement form, Dr. Bhattacharya checked boxes indicating that plaintiff could stand or walk "at least" two hours per day, and could sit for "less than about six hours" per day. (Tr. 125-26.) Dr. Bhattacharya further found plaintiff could lift 25 pounds, a restriction greater than

plaintiff's own description of his limitations, evidenced by his statement to Dr. Bhattacharya that he could lift 30 pounds. (Tr. 120, 125.) Nothing in Dr. Bhattacharya's opinion precludes the ALJ's imposition of four-hour limits on sitting, walking, or standing during an eight-hour work day, and the ALJ is not, as plaintiff appears to contend, required to produce evidence and affirmatively prove that a claimant can lift a certain weight or walk a certain distance. <u>Pearsall</u>, 274 F.3d at 1217 (8th Cir. 2001); <u>McKinney</u>, 228 F.3d at 863. Dr. Bhattacharya opined that plaintiff could stand and/or walk for "at least" two hours. His other options were to restrict plaintiff to "less than 2 hours", or to allow "about 6 hours." (Tr. 125.) A four-hour restriction, therefore, is reasonable and not precluded by Dr. Bhattacharya's report. Dr. Bhattacharya also had the opportunity to mandate the use of an assistive device for ambulation, and did not. Finally, as the Commissioner notes, Dr. Bhattacharya had ample opportunity in the body of his report and in the Medical Source Statement to opine that plaintiff was unable to perform any work, but did not so indicate.

The indication in Dr. Bhattacharya's report that plaintiff reported that he had been advised hip replacement is noteworthy. However, the undersigned notes that there is no indication in the St. Mary's Health Center records (where plaintiff obtained the only hip x-ray on record), or anywhere in the medical evidence of record, that hip surgery had ever been recommended. The undersigned further notes that plaintiff did not testify that he was told he needed hip

replacement surgery, and makes no argument to this Court regarding an alleged need for hip replacement surgery. If a physician had indeed recommended to plaintiff that he should have surgery, the burden was upon plaintiff to present evidence of such recommendation. <u>Goff</u>, 421 F.3d at 790 (A claimant bears the burden of establishing his RFC).

Furthermore, the balance of the medical evidence of record supports the ALJ's RFC determination, including his credibility determination. The ALJ extensively analyzed all of the medical evidence in the record, considered plaintiff's own description of his symptoms and limitations, and concluded that the credible evidence of record did not support a finding that plaintiff was unable to work. The ALJ properly noted that no physician stated that plaintiff's condition precluded all work. <u>See</u> <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017-18 (8th Cir. 1996) (it is proper for an ALJ to consider the lack of reliable medical opinions to support a claimant's allegations of a totally disabling condition; in fact, this was noted to be the "strongest support" in the record for the ALJ's determination); <u>Brown v. Chater</u>, 87 F.3d 963, 965 (8th Cir. 1996) (lack of significant medical restrictions imposed by treating physicians supported ALJ's decision denying benefits); <u>Cruse</u>, 867 F.2d at 1186 (the lack of objective medical evidence to support the degree of severity of alleged pain is a factor to be considered). Furthermore, the undersigned notes that, on January 17, 2006, Dr. Hanson indicated that plaintiff had "no restrictions" on his activity, and could pursue activities "as tolerated." (Tr. 199, 201.) Thus, the record

-32-

contains medical evidence which would support a finding of far fewer restrictions than the ALJ imposed.

The ALJ also noted plaintiff's lack of regular and sustained medical treatment, and further noted that, when plaintiff did seek medical treatment, he was treated conservatively with no documented recommendation for surgical intervention. See Long v. Chater, 108 F.3d 185, 188 (8th Cir. 1997) (functional limitations are inconsistent with failure to obtain regular medical treatment); Loving v. Department of Health and Human Services, Secretary, 16 F.3d 967, 970 (8th Cir. 1994) (conservative or minimal medical treatment militates against a finding of disability).

The ALJ noted that the record did not support the conclusion that plaintiff's minimal medical treatment was the result of his lack of insurance or inability to pay, as there was no evidence that plaintiff ever sought and was refused medical treatment or services. In addition, the undersigned notes plaintiff's comment to Dr. Hanson that he received medical treatment and medications at People's Clinic, and that even if they would not provide him with the medication Dr. Hanson recommended, he was prepared to pay for it himself. (Tr. 203.) The undersigned also notes that plaintiff testified during his first hearing that he had not sought treatment at ConnectCare since December of 2003 because he had no insurance, but admitted, upon questioning from the ALJ, that he had not been refused treatment. (Tr. 269.) It was therefore proper for the ALJ to consider the absence of ongoing medical treatment as inconsistent

with allegations of a totally disabling condition.  See Onstead v. Sullivan, 962 F.2d 803, 805 (8th Cir. 1992) (ALJ properly considered claimant's failure to seek medical attention as inconsistent with claims of severe disability); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997) (claimant's failure to seek medical assistance for her alleged physical and mental impairments contradicted her complaints of disabling conditions); McClees v. Shalala, 2 F.3d 301, 302-03 (8th Cir. 1993) (ALJ properly denied benefits to claimant who was seeking them for period during which claimant did not seek medical treatment, other than for a skinned elbow, and during which claimant was not taking any pain medication).

The undersigned notes that St. Mary's Health Center records do not indicate that plaintiff complained of left hip pain at any time during his  January 16, 2006 hospitalization.  See (Tr. 190-247); Stephens v. Shalala, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting allegations of back pain when no complaints made about such pain while receiving other treatment.)  The undersigned further notes that plaintiff continued to smoke despite his complaints of shortness of breath, and in fact testified during his first hearing that he smoked two to two and one-half packs of cigarettes per day, at least twice the amount he reported to his physicians while receiving medical treatment.[24]  (Tr. 277.)  The record documents repeated advice from physicians that plaintiff stop

_____

[24]While receiving treatment at ConnectCare and St. Mary's Health Center, plaintiff reported smoking one pack of cigarettes per day.  (Tr. 137, 200.)

smoking, and plaintiff admitted during the hearing that his doctors had advised against smoking.  (Tr. 106-07; 203; 277.)  "Failure to follow a prescribed course of remedial treatment without good reason is grounds for denying an application for benefits."  <u>Roth v. Shalala</u>, 45 F.3d 279, 282 (8th Cir. 1995).

The undersigned further notes that the record contains evidence that plaintiff may have been employed as a manager of an establishment called "Charley's Lounge" in January of 2006.  (Tr. 139, 190.)  Although not given significant weight, evidence that plaintiff was in fact employed detracts from his allegations of impairments precluding all work.  <u>Naber v. Shalala</u>, 22 F.3d 186, 188 (8th Cir. 1994) (work performed during any period claimant alleges he was under a disability may demonstrate an ability to engage in substantial gainful activity); <u>Zenker v. Bowen</u>, 872 F.2d 268, 270 (8th Cir. 1989) (present levels of work activity may indicate that a claimant is able to do more work that he or she is actually doing).

A review of the ALJ's determination of plaintiff's RFC reveals that he properly exercised his discretion and acted within his statutory authority in evaluating the evidence of record as a whole.  The ALJ conducted an exhaustive analysis of the record, and based his decision on all of the relevant, credible evidence, including the evidence from plaintiff's treatment providers, and Dr. Bhattacharya's consultative report.  For the foregoing reasons, the undersigned recommends a finding that the ALJ's determination of plaintiff's RFC is based upon substantial evidence on the record as

a whole.

   B.   <u>Fully and Fairly Developed Record</u>

        Plaintiff next contends that the ALJ failed to ensure a
fully and fairly developed record, inasmuch as Dr. Bhattacharya's
consultative opinion was the only evidence in the record addressing
plaintiff's ability to work.   Plaintiff's contention is without
merit.

        It is well-settled law that the ALJ is required to ensure
a fully and fairly developed record.  <u>Nevland</u>, 204 F.3d 853 (citing
<u>Warner v. Heckler</u>, 722 F.2d 428, 431 (8th Cir. 1983)).   Included in
this duty is the responsibility of ensuring that the record contains
evidence from a treating physician, or at least an examining
physician, addressing the particular impairments at issue.  <u>Nevland</u>,
204 F.3d at 858; <u>see</u> <u>Strongson v. Barnhart</u>, 361 F.3d 1066, 1071-72
(8th Cir. 2004).   A reviewing court has the duty of determining
whether the record presents medical evidence of the claimant's RFC at
the time of the hearing.  <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th
Cir. 1995).   Unless the record contains such evidence, the ALJ's
decision cannot be said to be supported by substantial evidence.  <u>Id.</u>

        In this case, following plaintiff's first hearing, the ALJ
ordered a consultative examination for plaintiff with Dr.
Bhattacharya, and then held a second hearing, during which he
solicited testimony from the VE concerning the limitations imposed by
Dr. Bhattacharya.   Furthermore, the record contained other medical
evidence which addressed the impairments plaintiff claimed prevented

-36-

him from working, none of which indicated any activity restrictions. In fact, Dr. Hanson specifically stated that plaintiff had no limitations on his activity. (Tr. 199, 201.)

It cannot be said that the record contained no medical evidence addressing the particular impairments at issue. A review of the record reveals that it contained medical evidence, from treating and examining physicians, of the claimant's RFC at the time of the hearing as discussed, <u>supra</u>, and the undersigned recommends a finding that the ALJ fulfilled his duty to ensure a fully and fairly developed record.

C. <u>Hypothetical Posed to Vocational Expert</u>

Plaintiff finally contends that the hypothetical question the ALJ posed to the VE did not capture the concrete consequences of plaintiff's impairments, and the VE's response could not therefore be considered substantial evidence to support the ALJ's decision. The undersigned disagrees.

Because the ALJ determined that plaintiff did not have any past relevant work, the burden shifted to the Commissioner to prove that plaintiff was capable of performing other work. <u>See</u> <u>Cantrell v. Secretary of Health and Human Services</u>, 867 F.2d 1137 (8th Cir. 1989). Because plaintiff had non-exertional impairments, the Commissioner was required to establish its proof through the testimony of a vocational expert. <u>Id.</u> "A hypothetical question posed to the vocational expert is sufficient if it sets forth impairments supported by substantial evidence in the record and

accepted as true by the ALJ." Hunt v. Massanari, 250 F.3d 622, 625 (8th Cir. 2001) (citing Prosch v. Apfel, 201 F.3d 1010, 1015 (8th Cir. 2000)). "[T]he ALJ may exclude any alleged impairments that [he] has properly rejected as untrue or unsubstantiated." Long, 108 F.3d at 187. Testimony from a VE based on a properly-phrased hypothetical question constitutes substantial evidence." Roe v. Chater, 92 F.3d 672, 675 (8th Cir. 1996).

As explained above, the ALJ asked the vocational expert to assume a person of plaintiff's age, education, work experience, and RFC which, as discussed above, the ALJ properly determined. In response, as noted above, the VE testified that work existed in substantial numbers in the local economy that an individual with such limitations could perform. The hypothetical posed by the ALJ properly reflected the impairments that the ALJ found to be supported by the record, as discussed above, and the ALJ was not required to include impairments not so supported. Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999.) ("A hypothetical question is sufficient if it sets forth the impairments which are accepted as true by the ALJ.")

A review of the record reveals that the ALJ's decision was supported by substantial evidence on the record as a whole. Because there is substantial evidence to support the Commissioner's decision, this Court may not reverse the decision merely because substantial evidence may support a different outcome, or because another court could have decided the case differently. Gowell v. Apfel, 242 F.3d

-38-

793, 796 (8th Cir. 2001); <u>Browning</u>, 958 F.2d at 821.


      Therefore, for all of the foregoing reasons,

      **IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be affirmed, and that plaintiff's Complaint be dismissed with prejudice.

      The parties are advised that they have until February 25th, 2008 to file written objections to this Report and Recommendation. Failure to timely file objections may result in waiver of the right to appeal questions of fact. <u>Thompson v. Nix</u>, 897 F.2d 356, 357 (8th Cir. 1990).


                             _Frederick R. Buckles_
                             UNITED STATES MAGISTRATE JUDGE

Dated this 14th day of February, 2008.